FILED
CLERK
2:31 pm, Aug 19, 2026
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
NORTHWELL HEALTH, INC.,

Plaintiff,

-against-

BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA,

Defendant.
-------------------------------------------------X

ORDER
23-CV-00603 (JS)(SIL)

APPEARANCES

For Plaintiff Northwell Health, Inc.: Timothy F. Butler, Esq.
Meredith F. McBride, Esq.
David J. McCarthy, Esq.
Butler Tibbets, LLC
Nine East 45th Street
9th Floor
New York, New York 10017

For Defendant Blue Cross And Blue Shield of South Carolina: Benjamin Watson, Esq.
Crowell & Moring, LLP
Two Manhattan West
375 Ninth Avenue
New York, New York 10001

SEYBERT, District Judge:

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, Defendant Blue Cross and Blue Shield of South Carolina ("Defendant" or "Blue Cross SC") objects to Magistrate Judge Steven I. Locke's May 5, 2026 Report and Recommendations ("R&R", ECF No.

79), which recommends granting in part and denying in part Defendant's Motion to Dismiss the Second Amended Complaint filed by plaintiff Northwell Health, Inc. ("Plaintiff" or "Northwell"). (See Obj., ECF No. 82; see also SAC, ECF No. 58; Motion, ECF No. 74; Support Memo, ECF No. 75; Reply, ECF No. 72.) Plaintiff opposes the Objection. (See Obj. Resp., ECF No. 84-1; see also Motion Opp'n, ECF No. 76.) Because the Court agrees with Judge Locke's sound reasoning, it OVERRULES Defendant's Objection and ADOPTS the R&R.

## BACKGROUND[1]

### I. Relevant Factual Background

The Court assumes the parties' familiarity with the factual background giving rise to this action (hereinafter the "Action"). However, for context and convenience, the Court briefly reiterates the relevant facts.

#### A. The Parties & Relevant Non-Parties

As summarized in the R&R:

> Northwell is a New York not-for-profit corporation that operates hospitals and other health care facilities. SAC ¶ 1. Defendant Blue Cross SC is a healthcare insurance company organized under the laws of South Carolina, with its principal place of business located in Columbia, South Carolina. Id., ¶ 2. Blue Cross SC "issues and/or administers healthcare insurance plans" that cover

[1] Terms of art defined in the R&R are adopted and used herein, familiarity with which is assumed.

> healthcare services to insured patients, paying or reimbursing all or part of the healthcare providers' services to those insured. Id. Between January 1, 2019 and December 31, 2022 (the "Relevant Period"), Northwell provided medically necessary services, supplies and equipment to certain identified patients who were insured by Defendant (the "Patients"). See id., ¶¶ 5-6. Empire Blue Cross and Blue Shield, now known as Anthem Blue Cross and Blue Shield ("Empire"), is an insurance company and operates in the New York counties where Northwell's health care facilities are located. Id., ¶ 13.
>
> The Blue Cross and Blue Shield Association ("BCBSA") is a national group comprised of Blue Cross Blue Shield insurance companies (the "Member Companies"), including Defendant and Empire. Id., ¶¶ 7-8, 34.

(R&R at 2-3.)

B. The Contracts

1. BCBSA, Empire, & Blue Cross SC

i. The BlueCard Program

All Member Companies have adopted agreements, standards, and rules governing their respective practices. (R&R at 4.) One such agreement requires participation in the "BlueCard Program," which allows an out-of-state Member Company's insureds to obtain in-network rates from providers located in an area serviced by a different BCBSA Member Company. (Id. at 3.) Pursuant to this Program, Defendant issues patients insurance "BlueCards," which identify Blue Cross SC as their insurer; the cards also state that participating providers will receive payment for covered

healthcare services. (Id. at 3-4.) When a patient insured by an out-of-state Member Company (a "Home Plan") receives care from an in-network provider of a local Member Company (a "Host Plan"), the BlueCard program calls for the Home Plan to reimburse the provider according to the in-network rates in the Host Plan's contract with the provider.[2] (Id. at 4-5.) When Plaintiff received a patient's BlueCard, it first determined whether Empire or another Member Company issued the card, and then contacted the relevant Home Plan "through the phone numbers or other contact method published on the [patient's BlueCard] to obtain prior authorizations for the services provided to the Patien[t]." (Id. at 4 (quoting SAC ¶ 23).)

ii. Member License Agreement and Controlled Affiliate Licensee Agreement

The Member Companies have collectively entered into a Member License Agreement and Controlled Affiliate Licensee Agreement. (Id. at 5.) According to the SAC, the Member License Agreement required Member Companies to comply with BCBSA-imposed standards and programs adopted by the Member Companies, including the BlueCard Program. (Id. at 6.) The Licensing Agreement includes language stating "nothing contained herein shall be construed to constitute the parties hereto (i.e., BCBSA and Defendant here) are

[2] In this Action, Empire is the "Host Plan," and Blue Cross SC is the "Home Plan."

partners or joint venturers, or either as the agent of the other[.]" (R&R at 6 (quoting SAC ¶ 38).)

iii. Other BCBSA Agreements

Several other agreements establishing other national practices between the Member Companies exist as well. According to the SAC, "as voting members of the Board of Directors, the Member Companies created and adopted certain agreements that create mutually agreed upon 'Member Standards', 'Member Guidelines', and other agreed upon rules and regulations, 'Members' Agreed Rules' for the Member Companies." (SAC ¶ 32.) These agreements "govern [the Member Companies'] interactions in connection with the BlueCard Program." (Id. ¶ 174.)

2. The Northwell-Empire Provider Agreement

On or about January 1, 2000, Northwell and Empire entered into the "Provider Agreement." (R&R at 7.) As summarized in the R&R:

> [The Provider Agreement] "sets forth the rates and terms by which Northwell is to be paid for the health care services provided to patients insured by Empire and BlueCard [Program] plans[,] and other contractual rights and obligations of the parties." SAC ¶ 51. Both parties agree that Blue Cross SC was not a direct signatory to the Provider Agreement. See D. Mot. at p. 6; Pl. Opp. at pp. 4-5.
>
> The Provider Agreement establishes that Northwell is an in-network provider for plans managed or issued by Empire and its affiliates. SAC ¶ 16. It also sets forth the

medically necessary care Northwell must provide to Patients, and the rate Northwell is to be paid for that care. Id., ¶¶ 17, 73, 182, 196-97. As to those insured by other BlueCard Plans, the Provider Agreement requires Northwell to provide healthcare services to patients who are "subscribers of Member Companies or their affiliates or subsidiaries" at the rates described in the Provider Agreement. Id., ¶¶ 48-49, 55. The Provider Agreement also limits the grounds on which Blue Cross SC may deny Northwell's claim for healthcare provided to a Patient. Id., ¶¶ 98, 166-67.

The Provider Agreement further states that any "Payer" is entitled to access to services of Northwell providers who participate in the Empire Network. Id., ¶¶ 63, 67, 102. Plaintiff alleges two definitions of "Payer" under the Provider Agreement, including any "BlueCard entity that insures a patient treated by Northwell;" and "any such Blue Card Plans' fully insured business." Id., ¶¶ 63-64. Under these definitions, according to Northwell, Defendant is a "Payer" obligated to pay Plaintiff for services rendered to Patients under the Provider Agreement. Id., ¶¶ 63-64, 66-71.

In addition, the Provider Agreement states that because Blue Cross SC is a Payer, its access to Northwell providers is subject to all provisions of the Provider Agreement, including the obligation of the non-Empire BlueCard Plan—here, Blue Cross SC—to pay for such services. Id., ¶¶ 67-71. Plaintiff asserts that Defendant is "bound" to comply with provisions in the Provider Agreement dictating how it processes Northwell claims and when it must pay Plaintiff. Id., ¶¶ 71-72. This Provider Agreement ensures that Blue Cross SC and its BlueCard Program plans can access Northwell's in-network services, rates and terms. Id., ¶ 73. It also requires the Home Plan—here, Defendant—to pay Plaintiff, and the Member Agreements between Empire and Blue Cross SC require Defendant to reimburse

> Empire for any payments made by Empire to Northwell on Defendant's behalf for treatment of Patients. Id., ¶¶ 73-74.
>
> Empire entered into the version of the Provider Agreement effective during the Relevant Period on its own behalf and as an agent for Blue Cross SC and all other Member Companies. Id., ¶¶ 14-15. Defendant, in turn, authorized Empire to act on its behalf to "include in [Empire's] agreements with [Northwell] terms ensuring all of the Member Companies have access to in-network services, rates, and terms of the Provider Agreement." Id., ¶ 53.

(R&R at 7-8.)

On November 9, 2007, Plaintiff and Empire allegedly amended the Provider Agreement, which was substantially rewritten, effective January 1, 2008. (SAC ¶ 60.) According to the SAC, the amended contract (the "2008 Amendments") made clear that Empire was not responsible for paying Northwell for out-of-state Home Plans; applicable Home Plans would pay instead. (Id. ¶ 61.) The 2008 Amendments' definition of "Payer" was defined to include the Home Plan insuring the patient, while expressly providing "[a]ll Payers" could access Northwell providers participating in the Empire network, subject to the Home Plan being "bound by the applicable rates and all other applicable terms" of the Provider Agreement. (Id. ¶¶ 63-72.)

### C. The Alleged Course of Dealing Between Northwell, Empire, and Blue Cross SC

Under the alleged BlueCard payment structure, when an in-network provider treats a patient insured by another Member Company, the provider submits the claim to the Host Plan, which prices the claim and forwards it to the Home Plan. (Id. ¶ 76.) The Home Plan then makes coverage determinations, returns its claim and payment determination to the Host Plan, and authorizes and directs the Host Plan to pay the provider, after which the Home Plan nearly simultaneously reimburses the Host Plan through a centralized banking process. (Id.) Under this alleged structure, the Home Plan, rather than the Host Plan, bears liability to the provider. (Id. ¶¶ 78, 81.) In this case, the alleged liability comes through the Provider Agreement. (Id. ¶ 78.)

Pursuant to this alleged structure, Plaintiff submitted $4,242,313.08 in claims for Defendant's patients to Empire, which then submitted the claims to Defendant. (Id. ¶¶ 94-97.) Defendant subsequently made its own claim determinations and directed Empire to communicate explanations of those determinations to Plaintiff. (Id. ¶¶ 97-101.) According to the SAC, Empire also made payments at Defendant's direction only and with funds Defendant provided for that purpose. (Id. ¶¶ 100-01.) Defendant made the claim determinations directly, although Empire facilitated the related communications and transfer of documents. (Id. ¶¶ 106-10.)

II. The SAC[3]

On July 25, 2025, Plaintiff filed the SAC. (See generally SAC.) The SAC alleges Defendant has underpaid Plaintiff; therefore, Plaintiff seeks $713,921.85 in damages, asserting claims for breach of: contract as to the Provider Agreement (the "Breach of Contract Claim"); third-party beneficiary contract as to certain agreements between BCBSA Member Companies (the "Third-Party Beneficiary Claim"); and a third-party beneficiary contract as to the Provider Agreement (the "Third-Party Provider Agreement Claim"). (Id.) The Breach of Contract Claim alleges Defendant, despite being a non-signatory to the Provider Agreement, is nonetheless bound by its terms, primarily because (1) it exercised control over the claims-determination, payment,

[3] Prior to filing the operative SAC:

> Defendant moved to dismiss the Amended Complaint on December 5, 2023. See Mot. to Dismiss, DE [19]. This Court entered a Report and Recommendation on August 13, 2024 with respect to the Motion to Dismiss. See DE [43] ("2024 R&R"). Defendant filed its Objection to the 2024 R&R on August 27, 2024, followed by Plaintiff's Reply in opposition to the Objection. DEs [44], [48], respectively. On March 10, 2025, Plaintiff sought leave to file a second amended complaint. DE [55]. On May 16, 2025, Judge Seybert terminated both Defendant's original Motion to Dismiss and the 2024 R&R pending a ruling on Plaintiff's Motion to Amend. See Elec. Order dated May 16, 2025.

(R&R at 10-11.)

and appeals processes, and (2) because an agency relationship existed between Defendant and Empire. (Id. ¶¶ 130-138; 150-172.)

Plaintiff's Third-Party Beneficiary Claim is based on the agreements between the Member Companies, including the Member Standards, Guidelines, and Agreed Rules. (Id. ¶¶ 173-76.) Plaintiff believes it is a third-party beneficiary of these agreements, which it contends are confidential between Member Companies, because: Empire and Defendant were both aware Northwell was contractually bound to treat Defendant's insureds; had agreed on the rates and process for paying Northwell; and understood Northwell had an interest only in correcting claim errors. (Id. ¶¶ 175, 182.)

Separately, Plaintiff's Third-Party Provider Agreement Claim alleges that, because Empire allegedly assigned some portions of the Provider Agreement to Defendant, "Northwell is a third party-beneficiary of Defendant's acceptance of Empire's partial delegation of the obligation to pay for access to Northwell's in-network services, rates, and terms." (Id. ¶¶ 192-06.)

III. Motion to Dismiss & Opposition

On November 21, 2025, Defendant served its Motion and accompanying Support Memo. (See Motion; Support Memo.) Defendant contends the Breach of Contract Claim fails because it: is not a

signatory to the Provider Agreement; never manifested an intent to be bound by the contract terms; and never conferred actual or apparent authority on Empire sufficient to create any agency relationship. (Support Memo at 6-11.) As to the Third-Party Beneficiary Claim, Defendant argues these intra-BCBSA agreements "are not sufficiently specific to plausibly create rights in a third-party, out-of-state healthcare providers." (Id. at 15.) Lastly, Defendant insists the Third-Party Provider Agreement Claim fails because Plaintiff cannot claim third-party beneficiary status under an agreement to which it is already a party. (Id. at 16-18.)

On December 22, 2025, Plaintiff served its Opposition. (See Obj. Resp.) In support of the Breach of Contract Claim, Plaintiff contends Defendant manifested an intent to be bound by the Provider Agreement by, inter alia, making final claim determinations, directing and funding payments, controlling communications and payment decisions, and handling appeals. (Id. at 19-21.) Plaintiff also argues the Breach of Contract Claim is plausibly pleaded under agency principles, as Empire had actual and apparent authority to bind Defendant. (Id. at 5-16.) Separately, Plaintiff also claims it exchanged consideration with Defendant when (1) it agreed to treat Defendant's patients and (2) Defendant agreed to pay pursuant to the Provider Agreement. (Id. at 21.)

On the Third-Party Beneficiary Claim, Plaintiff asserts it is an intended beneficiary of several agreements between the Member Companies, because those agreements required Defendant to pay Northwell directly at the Provider Agreement rates. (Id. at 21-25.) As to the Third-Party Provider Agreement Claim, Plaintiff maintains it is the intended beneficiary of certain terms it alleges were partially assigned to Defendant. (Id. at 25-27.)

On January 12, 2026, Defendant filed its Reply. (See Reply.)

IV. The R&R

On May 5, 2026, Judge Locke issued the R&R, which recommended denying dismissal of the Breach of Contract and Third-Party Beneficiary Claims and granting dismissal of the Third-Party Provider Agreement Claim. (See generally R&R.) As to the Breach of Contract Claim, Judge Locke identified seven key sets of facts that, taken as true, adequately pleaded Defendant assumed obligations under the Provider Agreement:

> (1) Empire received Northwell's statement of its billed charges, confirmed the Home Licensee, and forwarded the claims to Defendants (SAC ¶¶ 94-95);
>
> (2) Defendant made the final claim determination in accordance with the Provider Agreement terms (Id., ¶¶ 96-98, 115-16);
>
> (3) Defendant delivered its claim disposition to Empire and prohibited Empire from changing

> the claim disposition (Id., ¶¶ 99-100, 115-16);
>
> (4) Empire, at Defendant's direction, sent to Northwell, unaltered, the explanation of payment or the remittance advice that Empire received from Defendant (Id., ¶ 100);
>
> (5) Defendant either paid Northwell directly the amount specified in its explanation of payment, or gave Empire written direction and authorization to pay the amount to Northwell, and provided Empire the funds to do so (Id., ¶¶ 100-02, 115-16);
>
> (6) Defendant prohibited Empire from paying Northwell absent Defendant's express authorization and direction (Id., ¶¶ 105, 115-16, 76-80); and
>
> (7) Defendant handled any appeals submitted by Northwell (Id., ¶¶ 106-10).

(R&R at 17–18.)

Continuing, Judge Locke concluded the Breach of Contract Claim independently survived dismissal based upon Plaintiff's allegations that Empire acted with apparent authority as Defendant's agent.[4] (Id. at 19-21.) Specifically, Plaintiff alleged Defendant: engaged in a public communications campaign to providers about the BlueCard Program; represented to its insureds that Northwell was in-network; issued BlueCards directing patients

---

[4] Judge Locke separately determined "Plaintiff fail[ed] to allege any direct contract, agreement or interaction between Empire and Blue Cross SC that would create actual authority to bind Defendant to the Provider Agreement." (R&R at 19.) Neither party has objected to this conclusion, which the Court finds is free of clear error. See Nambiar v. Cent. Orthopedic Grp., LLP, 158 F.4th 349, 359 (2d Cir. Oct. 28, 2025) ("If a party fails to properly object to the R&R, the district judge reviews the R&R only for clear error.").

to present them to providers like Northwell; and caused Northwell to contact Defendant directly for prior authorizations. (Id. at 20-21.) Judge Locke further concluded the SAC adequately pleaded consideration because "Plaintiff has alleged that it provided contractual consideration to Blue Cross SC through its promises in the Provider Agreement and renewal terms, and Defendant provided its consideration through its obligations under the Licensee Agreement." (Id. at 21.)

Judge Locke also recommended denying dismissal of Plaintiff's Third-Party Beneficiary Claim, largely because Defendant's arguments were premature since "the Licensee Agreements were not submitted with the motion papers to the Court." (Id. at 22.) He relied upon Plaintiff's allegations that the relevant Member Company standards require Member Companies to "(i) contractually require their in-network providers to treat patients insured under any other Member Company's BlueCard plan; and (ii) provide the financial resources needed to pay for the healthcare that any patient they insured received from a provider who was in-network with another Member Company." (Id. at 22-23 (citing SAC ¶ 135).) The Court's Third-Party Beneficiary Claim analysis also relied, in part, upon Subaru Distributors Corporation v. Subaru of America, Incorporated, which held dismissal of a third-party beneficiary claim "is appropriate where the contract rules out any intent to benefit the claimant . . . or where the

complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." 425 F.3d 119, 124 (2d Cir. 2005).

Because Plaintiff could not "plausibly allege that it is a third party beneficiary to the very contract to which it is a direct signatory," the Court recommended dismissal of the Third-Party Provider Agreement Claim. (R&R 23–24.)

## V. Defendant's Objection & Plaintiff's Opposition

On May 19, 2026, Defendant filed the Objection, contesting the R&R's findings as to the Breach of Contract and Third-Party Beneficiary Claims.[5] (See generally Obj.) As to the Breach of Contract Claim, Defendant contends its alleged actions fall short of the high bar required to bind a non-signatory to an agreement, as its alleged claim determinations, communications, and payment directives were undertaken to comply with separate agreements between BCBSA Member Companies. (Id. at 4-8.) Defendant also objects to Judge Locke's agency recommendation, arguing its alleged conduct did not create the appearance that Empire was its agent, in part because the Provider Agreement purportedly disclaims any agency relationship. (Id. at 12–15.) In Defendant's

[5] Neither party objects to Judge Locke's recommended dismissal of the Third-Party Provider Agreement Claim, which appears to be free of clear error. Nambiar, 158 F.4th at 359.

view, Judge Locke's Breach of Contract Claim analysis also fails because no consideration flows directly between Plaintiff and Defendant. (Id. at 15-16.)

In Defendant's view, Judge Locke further erred in rendering its Third-Party Beneficiary Claim dismissal arguments premature. (Id. at 16-18.) Because the relevant language of the Licensing Agreements is identified in the SAC, Defendant argues the Court has all it needed to dismiss the Claim. (Id.) Defendant also contends Judge Locke misapplied Subaru, which Defendant maintains permits dismissal under these circumstances. (Id. at 19-20 (quoting Subaru, 425 F.3d at 124).)

On June 5, 2026, Plaintiff filed its Opposition, which largely defends Judge Locke's determinations. (See generally Obj. Resp.)

DISCUSSION

I. Applicable Law

A. Rule 12(b)(6)

A claim is properly dismissed pursuant to Rule 12(b)(6) where it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In determining whether to grant a Rule 12(b)(6) motion, courts must "accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor." Glob. Network Commc'ns, Inc. v.

City of N.Y., 458 F.3d 150, 154 (2d Cir. 2006). To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Basile v. Levittown United Tchrs., 17 F. Supp. 3d 195, 200 (E.D.N.Y. 2014) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do[.]" Twombly, 550 U.S. at 555 (internal citations omitted).

B. Report and Recommendations

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also FED R. CIV. P. 72(b)(3). A party objecting to an R&R "must lodge a specific objection to some specific aspect of the R&R," and "[w]hen a timely filed objection raises and properly briefs arguments previously rejected by the magistrate judge, the district judge must review those arguments de novo." Nambiar, 158 F.4th at 361. The Court need not review the findings and conclusions to which no proper objection has been made, and an objection "may not simply rest on

the briefs considered by the magistrate judge." Id.; Thomas v. Arn, 474 U.S. 140, 150 (1985).

II. Application

A. Breach of Contract Claim

1. Whether Blue Cross SC Manifested Intent to be Bound

"In general, '[u]nder New York law, a breach of contract action may only be maintained against a party to the contract,'" unless a specific exception applies, including where a non-signatory's "conduct manifests an intent to be bound by the contract." Jennings v. Hunt Cos., Inc., 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (quoting Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC, 285 F. Supp. 3d 579, 593 (W.D.N.Y. 2018); Horsehead Indus., Inc. v. Metallgesellschaft AG, 239 A.D.2d 171, 171-72, (1st Dep't 1997)). A party's purported intent to be bound is judged by "the totality of [the party's] expressed words and deeds" and may be inferred where a non-signatory "is in privity with the plaintiff or has assumed the obligations of the contract." Id. (quoting Roldan v. Second Dev. Servs., Inc., No. 16-CV-2364, 2018 WL 1701938, at *8 (E.D.N.Y. Mar. 30, 2018); MBIA Ins. Corp. v. Royal Bank of Can., 706 F. Supp. 2d 380, 396-97 (S.D.N.Y. 2009)). Intent to be bound exists where "the non-signatory was the 'real party in interest' to the contract, [] the non-signatory micromanaged the contract, [] the non-signatory was heavily involved in the

negotiation and drafting of the contract, and [] the non-signatory was the 'key decision-maker.'" Mersen USA EP Corp. v. TDK Elecs. Inc., 594 F. Supp. 3d 570, 580 (S.D.N.Y. 2022) (quoting RUS, Inc. v. Bay Indus., No. 01-CV-6133, 2004 WL 1240578, at *21 (S.D.N.Y. May 25, 2004); ESI, Inc. v. Coastal Corp., 61 F. Supp. 2d 35, 73-74 (S.D.N.Y. 1999)); see also MBIA, 706 F. Supp. 2d at 396-97 (intent can be deduced "from the [non-signatory's] participation in the negotiation of the contract, or if the [signatory] is a dummy for the [non-signatory], or if the [signatory] is controlled by the [non-signatory] for the [non-signatory's] own purposes").

The SAC alleges Defendant, after receiving Plaintiff's billed charges through Empire: made final claim determinations; prohibited Empire from changing claim determinations or making unauthorized payments; directed Empire either to send unaltered explanations of payment or to pay Plaintiff directly; and handled Plaintiff's appeals. (R&R at 17 (citing SAC ¶¶ 76-80, 94-102, 105-10, 115-16).) These allegations appear far more consistent with "key decision-maker" status than "merely assisting in the administration of" the Provider Agreement. (Obj. at 10 (quoting Mersen, 594 F. Supp. 3d at 581-82 (further citation omitted)).) Indeed, based upon these allegations, Empire had no discretion in many of its most important dealings with Plaintiff.

This course of dealing also undermines Defendant's reliance upon certain language from the Provider Agreement, regarding Empire's responsibility to make payments to plaintiff for health services, as well as:

> that "Empire is not contracting with [Northwell] as an agent of [the BCBS Association]," and that "no person, entity or organization other than Empire shall be accountable or liable to [Northwell] for any of Empire's obligations to [Northwell] created under this Agreement."

(Obj. at 8 (citing Provider Agreement, which includes a sealed portion thereof).)

Even assuming this language facially precludes Defendant from being a party to the Provider Agreement, its non-discretionary directives to Empire tell a different story. Indeed the SAC's allegations are inconsistent with this excerpt. Thus, dismissal may be inappropriate where a course of dealing is inconsistent with contractual disclaimers. See Roldan, 2018 WL 1701938, at *8 ("[e]ven if the Court construed the 2008 Agreement to contain a condition precedent, [Defendant's] conduct suggests that the condition was either met or waived").[6] Based on the SAC's

[6] Defendant also relies upon this contract language to argue no agency relationship existed between Empire and Defendant. This argument fails for the same reason. See In re Parmalat Sec. Litig., 377 F. Supp. 2d 390, 404 (S.D.N.Y. 2005) ("written disclaimers of agency are not controlling [ . . . ] where a principal's actions are 'sufficiently inconsistent' with any such disclaimer or limitation of authority").

allegations, it would be premature to bar discovery on whether Blue Cross SC manifested an intent to be bound to the Provider Agreement.

Defendant's citation to Northwell Health, Inc. v. Blue Cross & Blue Shield of Massachusetts, Inc. ("BCBS Massachusetts") is also unavailing. No. 23-CV-0977, 2024 WL 3637964 (E.D.N.Y. Aug. 2, 2024). At first glance, BCBS Massachusetts presents a very similar fact pattern: an action between Northwell and an out-of-state BCBSA Member Company concerning contracts between Northwell and Empire. Id. at *1. The BCBS Massachusetts court dismissed the breach of contract claim, in part because there were no allegations that "Blue Cross Massachusetts acknowledged that it was the actual party in interest or micro-managed performance under the Hospital Agreements." Id. at *11 (citing Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc., No. 05-CV-7776, 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007)). Here, by contrast, there are several allegations showing Defendant "micro-managed the performance" of Empire, including by directing claim determinations, payment authorizations, appeals, and direct communications with Plaintiff. (R&R at 17 (citing SAC ¶¶ 76-80, 94-102, 105-110, 115-16).)

Stanford Health Care v. CareFirst of Maryland, Inc., an out-of-Circuit case Defendant cites in support of the Objection,

is similarly unavailing notwithstanding its facial similarity. (Obj. at 11-12 (citing 716 F. Supp. 3d 811 (N.D. Cal. 2024)).) In Stanford Health Care, a plaintiff hospital alleged an out-of-state BCBSA Member Company "accessed the discounted rates that were negotiated in Stanford's contract [the Home Plan], and that defendants should therefore be liable under the [Host Plan] contract to pay for their enrollees' medical care at Stanford." Id. at 817. The Stanford Health Care plaintiff also alleged it "contacted defendants to verify the patients' health plan eligibility and obtain defendants' authorization," after which the Home Plan "offered to reimburse Stanford should medically necessary care be provided." Id. at 813. But the SAC's allegations regarding how Defendant controlled and micromanaged Empire's payments and communications go well beyond Defendant's mere access to certain rates and offers for reimbursement. As such, this out-of-state case does not warrant dismissal.

2. Whether Empire Was Blue Cross SC's Agent

As the R&R correctly documented with respect to agency principles:

> [U]nder New York law, a principal-agent relationship requires the following elements: "(1) a manifestation by the principal that the agent shall act for him; (2) acceptance of the undertaking by the agent; and (3) an understanding between the parties that the principal is to be in control of the undertaking." Anwar v. Fairfield Greenwich

> Ltd., 728 F. Supp. 2d 372, 459 (S.D.N.Y. 2010) (citation omitted). An agent's authority to bind its principal to a contract is either actual or apparent. Highland Cap. Mgmt. LP v. Schneider, 607 F.3d 322, 327 (2d Cir. 2010). "Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf." Id. "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." Id. (citation omitted). Under this form of agency, a principal must communicate "words or conduct" to that third party "that give rise to the appearance and belief that the agent possesses authority to enter into a [contract]." Id. (citing Wells Fargo Home Mortg., Inc. v. Hiddekel Church of God, Inc., 1 Misc. 3d 913(A), 781 N.Y.S.2d 628 (Sup. Ct. Kings Cnty. 2004)). Nevertheless, "'[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation.'" Id. at 328 (quoting Ford v. Unity Hosp., 32 N.Y.2d 464, 472, 299 N.E.2d 659 (1973)).

(R&R at 18-19.)

Defendant contends the R&R erred in determining its communications and actions, which it characterizes as "routine", supported an apparent authority finding. (Obj. at 13 (citing Highland, 607 F.3d at 328; Holtzbrinck Public Holdings, L.P. v. Vyne Commc'ns, Inc., No. 97-CV-1082, 2000 WL 502860 (S.D.N.Y. Apr. 26, 2000)).) In particular, Defendant cites Highland for the proposition that an agency relationship cannot exist absent conduct by a defendant inducing the plaintiff to believe the agent

could bind the principal. (Id. (citing Highland, 607 F.3d at 328).) Defendant also cites to Holtzbrinck Public Holdings for the proposition that apparent authority may be found where a defendant "attended all of the meetings between the parties" during negotiations and "always took the lead on behalf of [the defendant] in the negotiations," a level of involvement absent in the SAC. (Id.)

First, the Court disagrees with Defendant's characterization of its actions as "routine communications". The SAC alleged several examples that could reasonably show Defendant had binding authority, including because Defendant: communicated the mechanics of the BlueCard Program's treatment of Home Plans; identified Plaintiff's facilities as being "in network" and conveyed that only the Home Plans would negotiate contracts on behalf of the Member Companies. (See SAC ¶ 21, 46); see also Greene v. Hellman, 51 N.Y.2d 197, 204 (1980) (agency relationship exists where alleged principal "reasonably [gave] an appearance of authority"). At the motion to dismiss stage, such allegations suffice to carry the agency theory to discovery.

Second, Defendant's reliance on Highland and Holtzbrinck is misplaced because both cases are factually distinct from this Action. In Highland, the Second Circuit found no agency relationship where the alleged agent purported to bind the

defendants, highlighting that, before negotiations began, the alleged agent had signed a letter agreement with his counterparty stating the defendants could not be bound without their specific approval of the final terms, a limitation the defendants' alleged agent repeatedly emphasized orally. 607 F.3d at 324-26, 329. No such repeated admonitions disclaiming authority exist here. To the contrary, Plaintiff has alleged Defendant exercised a large degree of control over Empire, on matters ranging from communications with Plaintiff to claim determinations. (See SAC ¶¶ 76-80, 94-102, 105-10, 115-16.)

Defendant also attempts to contrast Holtzbrinck with the facts of this case, observing Holtzbrinck recognized an agency relationship where an agent "attended all of the meetings between the parties" during negotiations and "always took the lead on behalf of [the defendant] in the negotiations." (Obj. at 13 (citing 2000 WL 502860, at *8).) Because Blue Cross SC's representatives were not alleged to have attended meetings or lead direct negotiations, Defendant appears to suggest an agency finding cannot be maintained under the facts alleged. (Id. at 13.) However, nothing in Holtzbrinck indicates attendance at meetings or direct leading of negotiations are necessary to establish an agency relationship, or that the facts Plaintiff has alleged are insufficient.

3. Whether Consideration Existed

In determining whether consideration existed, the R&R explained:

> Defendant argues that Northwell's breach of contract claim fails because it has not alleged any exchange of consideration between it and Blue Cross SC. The Court is not persuaded. Plaintiff has alleged that it provided contractual consideration to Blue Cross SC through its promises in the Provider Agreement and renewal terms, and Defendant provided its consideration through its obligations under the Licensee Agreement. Pl. Opp at p. 21. As Plaintiff's breach of contract claim is permitted to proceed on other bases, the sufficiency of the alleged consideration can be further addressed in discovery. For all of these reasons, the Court respectfully recommends that Defendant's motion to dismiss Plaintiff's breach of contract claim be denied.

(R&R at 21.)

The Court finds Judge Locke's reasoning persuasive. Defendant contends no consideration exists because: no consideration flowed directly between Plaintiff and Defendant; and because it had a pre-existing duty to pay for patient services, which flows only from its obligations to those patients. (Obj. at 15-16.) However, Plaintiff correctly points out that such performance constitutes a "mutual benefit satisf[ying] the requirement for consideration" and, in any event, the SAC has plausibly shown Defendant manifested intent to be bound by the Provider Agreement and that agency principles apply. (Obj. Resp.

at 7-8; Motion Opp'n at 21.) And, as Judge Locke explained, such deficiencies around consideration can be addressed in discovery. (See R&R at 21.)

Because each of Defendant's grounds for objecting to Judge Locke's Breach of Contract Claim findings are unavailing, Defendant's Objection is OVERRULED.

B. Third-Party Beneficiary Claim

1. Whether Dismissal Is Premature

Defendant contends a review of the Member Companies' full "Licensing Agreements"[7] is not necessary to dismiss Plaintiff's Third-Party Beneficiary Claim. (Obj. at 17-18.) In its view, the facts and excerpts before the Court, which state that licensees are required to "effectively and efficiently participate" in the BlueCard Program and to "ensure [] financial performance", are sufficient because they evince no intent to benefit any third party. (Id.) In Opposition, Plaintiff argues its Third-Party Beneficiary Claim is not based solely upon the "Licensing Agreements between the BCBSA and Defendant and Empire respectively," but also on the Member Companies' Member Standards, Guidelines, and Agreed Rules. (Obj. Resp. at 8 (citing SAC ¶¶

[7] Defendant's Objection refers to the "Licensing Agreements", which it does not define, but cites to SAC paragraphs referring to the Member Standards, Guidelines, and Rules. (See Obj. at 13.)

32-35, 39-43) ("the Member Companies created and adopted certain agreements that create mutually agreed upon 'Member Standards', 'Member Guidelines', and other agreed upon rules and regulations, 'Members' Agreed Rules' for the Member Companies").)

Without access to all of the relevant Member Company agreements, the Court agrees with Judge Locke that dismissal would be premature. Judge Locke correctly accepted the SAC's allegations that the Licensing Agreement terms require Member Companies to "each include in their agreements with in-network providers contractual terms requiring the in-network provider to treat patients insured under any other BCBSA Member Company's BlueCard plan" and "each provide the financial resources needed to pay for the healthcare that any of their respective patients received from a provider who had an in-network agreement with a BlueCard Plan insurance plan in another state." (SAC ¶ 135.) Moreover, some of the contract "excerpts" Defendant cites to in support of this argument are merely allegations from the SAC that paraphrase the agreements, and do not appear to be from the contracts themselves. (See Obj. at 7 (citing SAC ¶ 40).)

Unlike the third-party beneficiary claim dismissed in BCBS Massachusetts, Plaintiff pleads specific facts concerning the Member Companies' Standards, Guidelines, and Rules. Compare BCBS Massachusetts, 2024 WL 3637964, at *13 n.5 ("[a]lthough Northwell

references other agreements as the basis of its third-party beneficiary claim, it has not submitted them before the Court or identified any specific provision of them as the basis of its claim"), with SAC ¶¶ 174-176 ("The Member Standards, Member Guidelines, and the Members' Agreed Rules created by the Member Companies sets forth agreements between and among the Member Companies to govern their interactions in connection with the BlueCard Program.").

2. The Court Correctly Interpreted *Subaru*

Because Subaru permits dismissal where (1) "the contract rules out any intent to benefit the claimant" or (2) "where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant", Defendant contends the SAC's reliance on "language in the contract" (Obj. at 19-21 (quoting Subaru, 425 F.3d 119, 124-25).)

A brief recitation of Subaru's facts and reasoning demonstrates why Defendant is incorrect. In Subaru, the Second Circuit reviewed full provisions of a contract to determine whether an alleged third-party beneficiary had rights under the agreement. Subaru, 425 F.3d at 124-25. The Second Circuit determined the agreement's structure ruled out any third-party beneficiaries, as anti-assignment and arbitration clauses that applied only to the

signatories indicated no other non-parties were contemplated. Id. at 124-25; see also Bild v. Konig, No. 09-CV-5576, 2011 WL 1563576, at *2 (E.D.N.Y. Apr. 25, 2011) (denying dismissal of third-party beneficiary claim where contract at issue was heavily redacted). The current record, by contrast, does not definitively preclude a third-party beneficiary claim, as the anti-assignment and arbitration clauses in Subaru did. As such, this claim should proceed to discovery.

Because each of Defendant's grounds for objecting to Judge Locke's Third-Party Beneficiary Claim findings are unavailing, Defendant's Objection is OVERRULED.

**CONCLUSION**

For the stated reasons, IT IS HEREBY ORDERED that the Defendant's Objection is OVERRULED. Accordingly:

I. The Court ADOPTS Judge Locke's Report and Recommendation to the extent it recommends denying dismissal of the Breach of Contract Claim;
II. Relatedly, the Court ADOPTS Judge Locke's Report and Recommendation to the extent it recommends denying dismissal of the Third-Party Beneficiary Claim; and
III. The Court ADOPTS Judge Locke's Report and Recommendation to the to the extent it recommends granting dismissal of Third-Party Provider Agreement Claim; and

Having adopted the R&R, the Court FURTHER ORDERS:

I. Because the SAC's Breach of Contract and Third-Party Beneficiary claims are sufficiently stated, the Court DENIES Defendant's Motion to Dismiss as to these claims; and
II. Because neither party objected to the R&R's recommendation that the Third-Party Provider Agreement Claim be dismissed,

and because Judge Locke's findings on the same are free of clear error, the Court GRANTS Defendant's Motion as to this claim.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August 19, 2026
Central Islip, New York